IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE EDGELL, | ) | CASE NO. 5:19CV2398 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Joyce Edgell ("Edgell") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Edgell filed an application for SSI in December 2016, alleging a disability onset date of October 1, 2016. Tr. 209. She alleged disability based on the following: back issue, Parkinson's disease, sleep apnea, stroke, asthma, panic attack, rapid heart beat, high blood pressure, factor five clotting disorder, anemia, mobility problems, fatigue, short term memory loss, and "use shower chair." Tr. 228. After denials by the state agency initially (Tr. 120) and on reconsideration (Tr. 140), Edgell requested an administrative hearing. Tr. 162. A hearing was held before an Administrative Law Judge ("ALJ") on January 25, 2019. Tr. 51-85. In his March

19, 2019, decision (Tr. 33-44), the ALJ determined that there are jobs in significant numbers in the national economy that Edgell can perform, i.e., she is not disabled.  Tr. 43-44.  Edgell requested review of the ALJ's decision by the Appeals Council (Tr. 204) and, on August 14, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Edgell was born in 1965 and was 51 years old on the date she filed her application.  Tr. 27.  She completed the twelfth grade and last worked in 2002.  Tr. 60.

### B. Relevant Medical Evidence

On March 13, 2015, Edgell saw her chiropractor, Timothy Hiner, D.C., whom she had seen since 2002, complaining of low back pain, pain radiating down her legs, constant spasms, and pain between her shoulder blades.  Tr. 363, 357.  She had a history of injury and surgical spinal repair and fusion in 2004.  Tr. 363.  Upon exam, she had pain with palpation of her thoracic spine with moderate muscle spasms in her thoracic area and positive straight leg raises on the right.  Tr. 363.  Hiner performed an adjustment, traction, used ice, and provided her with prescriptions for thoracic and lumbar x-rays.  Tr. 363.

An x-ray of Edgell's lumbar spine dated April 17, 2015, showed post fusion at L5 and S1, no significant change in alignment with flexion and extension, and no change in alignment when compared to her previous x-ray in 2011.  Tr. 360.

On April 24, 2015, Edgell returned to Hiner for chronic back pain management.  Tr. 364. That day her pain was sharp, moderate, did not radiate, and was rated 5-6/10.  Tr. 364.  On exam, she had pain with palpation of her thoracic spine with moderate muscle spasms in her paraspinal

muscles and positive straight leg raises on the right.  Tr. 364.

On January 13, 2016, Edgell saw Hiner, who noted low back pain and tenderness in her sacroiliac area bilaterally and mild spasms bilaterally.  Tr. 366.  Her range of motion was restricted because of pain.  Tr. 366.  Hiner assessed lumbar somatic dysfunction and thoracic somatic dysfunction.  Tr. 366.

On February 24, 2016, Edgell saw Hiner complaining of moderate low back pain radiating to her right leg, rated 5-6/10.  Tr. 370.  She also reported pain, rated 4/10, between her shoulder blades.  Tr. 370.  Upon exam, she had a decreased range of motion and a right-sided muscle spasm in her lumbar spine.  Tr. 370.

On March 2, 2016, Edgell complained to Hiner of low back pain, pain in her legs, and some balance issues when walking up stairs.  Tr. 371.  Upon exam, she had pain and muscle spasms in her lumbar spine with decreased guarding of her lumbar spine.  Tr. 371.

On May 18, 2016, Hiner drafted a letter to Edgell's insurance company requesting more visits.  Tr. 479.  He stated that, as a result of chiropractic treatment, Edgell's functioning had improved: she is able to perform daily activities with less pain, she takes less medication and is able to sleep better at night, and her pain and muscle spasms are relieved.  Tr. 479.  He stated that he had treated her once a week and requested she be permitted to continue treatment once every two weeks "to retain the relief of symptoms that she has achieved thus far."  Tr. 479.  He remarked that she continued to have pain and muscle spasms in her low back and thoracic spine. Tr. 479.

On June 9, 2016, Edgell had a nerve conduction study done due to thumb pain.  Tr. 316. The result was evidence of mild bilateral carpal tunnel syndrome.  Tr. 316.  She then saw Dr. Chandos, M.D., for her Parkinson's disease.  Tr. 324.  She complained of thumb pain, increased

tremors, and mood issues related to her pain.  Tr. 324.  Upon exam, she had mild postural tremor

and a stable gait.  Tr. 325.  Dr. Chandos prescribed Sinemet for her Parkinson's disease.  Tr. 324.

On June 29, 2016, Edgell saw Hiner and reported right-sided, moderate, low back pain,

rated 5-6/10.  Tr. 386.  Upon exam, she had right-sided pain with palpation, decreased range of

motion, and muscle spasm.  Tr. 386.

On August 10, 2016, Edgell went to the Crystal Clinic for an ankle and foot examination.

Tr. 335.  Upon exam, she had a normal gait on the right and left, ambulated without difficulty,

but favored the right lower extremity.  Tr. 335.  X-rays were taken and she was assessed with

acquired mallet toe of the third toe on her right foot, arthritis of the same toe, mucous cyst of the

same toe, and a history of Cerebrovascular accident (CVA) affecting the right side of her body.

Tr. 336.  Non-surgical, conservative treatment was recommended, including a prescription for a

silicone sleeve and to stop picking at the skin.  Tr. 337.

On August 12, 2016, Edgell saw Dr. Pennington, M.D., complaining of bilateral hand

numbness, tingling, and pain rated 7/10.  Tr. 343.  Edgell had x-rays of her wrists taken: her left

wrist x-ray showed carpometacarpal (CMC) arthritis in her left thumb (Tr. 340) and an x-ray of

her right wrist showed osteoarthritic changes in her right CMC joint (Tr. 341).  Dr. Pennington

discussed non-operative and operative treatments.  Tr. 346.  It was decided to proceed with non-

operative treatment and Dr. Pennington commented that her CMC arthritis was minimal

bilaterally.  Tr. 346.  Edgell was to continue her home exercise program, increase activities as

tolerated, start taking Motrin, and follow up as needed if symptoms don't improve.  Tr. 346.

On August 17, 2016, Edgell saw Hiner complaining of low back pain and stiffness, worse

on the right, and decreased range of motion due to pain and spasm.  Tr. 389.  Upon exam, she

had pain with palpation, limited range of motion, and muscle spasms in her thoracic and lumbar

spine.  Tr. 389.  Hiner noted that she responded well to treatment.  Tr. 389.  A similar treatment note memorialized her October 5, 2016, visit.  Tr. 393.

On November 9, 2016, Edgell visited Hiner complaining of 8/10 pain in her back radiating to her leg.  Tr. 394.  Upon exam, she had pain with palpation in her lumbar and thoracic spine, muscle spasms in her thoracic and lumbar paraspinal muscles, and a decreased range of motion.  Tr. 394.  She responded well to treatment.  Tr. 394.

On November 14, 2016, Edgell saw her internist, Dr. Black, M.D., who listed her diagnoses as COPD, hypertension, morbid obesity, lumbar spinal surgery, depression, Parkinsonism, sleep apnea, and "? stroke vs. TIA 2011."  Tr. 351.  He prescribed medications. Tr. 351.

On January 12, 2017, Edgell followed up with Dr. Chandos for her Parkinson's disease, which Dr. Chandos assessed as stable on current treatment.  Tr. 573.  Upon exam, she had adequate strength, no tremor, and a stable gait.  Tr. 573.  He refilled her medications and she was to return in six months.  Tr. 573.

On March 28, 2017, imaging of Edgell's low back showed status post instrumented arthrodesis of L5-S1 without evidence of hardware failure.  Tr. 464.

On May 19, 2017, Edgell saw Hiner complaining of mid back pain and difficulty raising her right arm.  Tr. 562.  Hiner adjusted her spine, which alleviated her symptoms, and remarked that she was to perform "home ice and stretching and walking exercises."  Tr. 562.

On July 12, 2017, Edgell followed up with Dr. Chandos for her Parkinson's disease.  Tr. 570.  Upon exam, she had adequate strength, no tremor, and a stable gait.  Tr. 570.  He refilled her medications and she was to return in six months.  Tr. 570

On July 20, 2017, Edgell saw Dr. Wynne, D.O., at Comprehensive Pain Management for

pain in her right shoulder, neck, back, and bilateral hands.  Tr. 579.  She reported that physical therapy and a TENS machine had not been helpful, and that caudal injections had been helpful but that she was no longer a candidate due to her stroke in 2011.  Tr. 579.  Upon exam, she rose from a seated position with difficulty, had a decreased range of motion and tenderness in her cervical and lumbar spine, tenderness in her SI joints and hips, negative straight leg raise tests, a positive Tinel's sign in her wrists, no tremors, and normal sensation, strength, reflexes, and gait. Tr. 580-581.  She was assessed with chronic pain syndrome, radiculopathy and spondylolisthesis in her lumbar region, post laminectomy syndrome, myalgia, carpal tunnel syndrome, and cervicalgia.  Tr. 581.  Dr. Wynne started her on Topamax for chronic pain syndrome and she was to follow up in four weeks.  Tr. 581.

On July 28, 2017, Edgell saw Dr. Drummond, M.D., at Comprehensive Pain Management for a "required [Behavioral Health]" evaluation.  Tr. 575.  Her exam findings were normal.  Tr. 575.  She reported that her most significant weakness was dealing with frustration related to dealing with her pain.  Tr. 575-576.  She received psychiatric medication (Wellbutrin) from Dr. Chandos for anxiety and PTSD.  Tr. 576.  She had attended counseling but stopped because she did not want to do group therapy as her counselor had insisted.  Tr. 576.  She was assessed with PTSD, chronic, and told to follow up in two weeks.  Tr. 576, 578.

On January 17, 2018, Edgell had an office visit with Dr. Drummond for PTSD.  Tr. 764. They practiced relaxation techniques, which Edgell was to practice at home until her next visit in two weeks.  Tr. 765.

On January 26, 2018, Edgell saw Dr. Wynne for a follow up appointment.  Tr. 760.  She reported pain in her right shoulder, neck, back, and bilateral hands.  Tr. 760.  Her exam findings were the same as her prior visit.  Tr. 760-761.  Dr. Wynne adjusted her medication and ordered

physical therapy for her carpal tunnel syndrome.  Tr. 762.  She commented that Edgell had not been seen since her initial visit in July 2017, and that an x-ray was ordered at that time but had not been completed.  Tr. 762.  Edgell was to continue wearing her carpal tunnel braces and was referred to physical therapy for her hands.  Tr. 762.

On June 19, 2018, Edgell saw Dr. Black for various conditions including morbid obesity, arthritis, sleep apnea, Parkinsonism, and carpal tunnel syndrome.  Tr. 596.  She was diagnosed with chronic back pain, morbid obesity, Parkinsonism, and noncompliance.  Tr. 596.

On July 17, 2018, Edgell went to the emergency room with complaints of chest pain.  Tr. 725.  She was diagnosed with angina pectoris, coronary artery disease, and hypertension, and advised to follow up with her physician.  Tr. 728.

On September 4, 2018, Edgell saw a certified nurse practitioner at the Crystal Clinic Orthopedic Center for an evaluation for lower neck pain, currently rated 6/10.  Tr. 801.  She reported constant neck pain since her stroke in 2011.  Tr. 801.  The pain was worse on the right side of her neck and shoulder area, her right arm was stiff and weak, and she had numbness and tingling in her right hand.  Tr. 801.  She stated that she had had a workup of this problem a couple of years prior and was told it was carpal tunnel syndrome.  Tr. 801.  She had been seeing a chiropractor for 20 years and had last seen him in August.  Tr. 801.  She reported being treated with anti-inflammatory medications, including over six months on Motrin which improved her symptoms, and that no testing has been completed for these symptoms.  Tr. 801.  She stated that she did not participate in a regular exercise program.  Tr. 802.  An x-ray of her cervical spine was taken and it showed moderate degenerative disc disease at C5-C6.  Tr. 806.  Physical therapy was recommended but Edgell declined.  Tr. 804.  She was assessed as a candidate for conservative treatment, and fusion surgery was not recommended due to her medical history.  Tr.

804.  She was assessed with degenerative disc disease of the cervical spine and an MRI was ordered.  Tr. 804.

An October 2018 MRI of Edgell's cervical spine showed herniated discs at C5-C6 and C6-C7 with mild flattening of the ventral cord and degenerative changes.  Tr. 799.

On December 19, 2018, Edgell saw Dr. Gebel, M.D., for an evaluation of stroke, Parkinson's disease, and cervical and lumbar spine issues.  Tr. 810.  He diagnosed the following: stroke due to Leiden V mutation and advised she continue her aspirin; Parkinson's disease and advised she continue her Sinemet; and right neck/upper extremity combined spasticity and started her on Gabapentin.  Tr. 813.  He referred her to psychiatry for her depression and anxiety symptoms and started her on Vitamin D supplements.  Tr. 813.

On January 4, 2019, Edgell saw Dr. Pennington for a follow-up for her carpal tunnel.  Tr. 794.  She asked about obtaining a different kind of splint, as hers seemed too large and were uncomfortable.  Tr. 794.  She rated her right wrist pain as currently 0/10, stated that, at its worst, it was 5/10, and she also had occasional tingling in it.  Tr. 794.  She reported that she had fallen the past September due to slipping down the stairs.  Tr. 794.  Upon exam, she was tender to palpation in her thumb joints, consistent with arthritis.  Tr. 797.  She was given cortisone injections in her thumbs.  Tr. 797.

On January 17, 2019, Edgell saw Dr. Black complaining of shortness of breath, panic attacks, and pain in her left shoulder.  Tr. 808.  She was counseled to return in six months.  Tr. 808.

### C. Medical Records Submitted to the Appeals Council

On March 28, 2019, nine days after the ALJ's decision, Edgell saw Dr. Gebel.  Tr. 10.  She reported that the Gabapentin helped with her hand pain.  Tr. 10.  Dr. Gebel wrote that Edgell

spent most of the visit explaining why her SSI application had been denied and expressed her dissatisfaction with the SSI physician who wrote she was an alcoholic due to her report that she had her first drink at 13.  Tr. 10.  She told him that she had an old, longstanding work injury that affected the right side of her body; fibromyalgia, which meant she could not work more than a few minutes at a time; and that she was always tired and fatigued, but that she could not wear her CPAP machine because her neighbors smoked weed at night, which affected her breathing.  Tr. 10-11.  Dr. Gebel's impressions were an old stroke due to Leiden V mutation and mild right-sided spastic paresis due to the stroke.  Tr. 11.  He increased her Gabapentin and referred her for a functional capacity evaluation to assess her capacity to work and to assess the validity of her subjective complaints due to her stated disability.  Tr. 11.

On June 16, 2019, Edgell had a functional capacity evaluation with a physical therapist, who assessed her as being in the sedentary physical demand category.  She could occasionally tolerate above shoulder reaching, forward reaching, bending, walking, fine coordination, gross coordination, pinching and simple grasping.  Tr. 19.

On July 10, 2019, Edgell saw Dr. Gebel for a follow-up visit.  Tr. 22.  She reported a flare-up of her carpal tunnel syndrome, which, Dr. Gebel noted, she had declined surgery for in the past.  Tr. 22.  She had stopped her Gabapentin due to lack of efficacy and was willing to try Lyrica.  Tr. 22.  Dr. Gebel prescribed Lyrica and Vitamin B6 and instructed her to wear the wrist splints she preferred that he had ordered for her.  Tr. 22.

### D. Opinion Evidence

#### 1. Treating Chiropractor

On March 23, 2016, Hiner drafted a letter "regarding handrails."  Hiner wrote that Edgell is a stroke patient who deals with balance issues and difficulty getting up and down stairs.  He

recommended she have handrails on both sides of all stairwells to avoid falling down the stairs. Tr. 359.

On December 21, 2016, Hiner described Edgell's limitations, stating that she cannot sit, stand, or walk without increasing low back pain and radicular signs and symptoms.  Tr. 358.

On May 11, 2017, Hiner completed a questionnaire stating that Edgell has neck and low back pain; spasms and radicular pain down her right leg, causing a shortened stride on the right; and a decreased range of motion in her lumbar spine.  He stated that her symptoms have persisted for 15 years despite therapy and that she is compliant with therapy.  Tr. 470.

On July 27, 2018, Hiner completed a medical statement on behalf of Edgell.  He listed her diagnoses: post-laminectomy syndrome, history of stroke, and degenerative disc disease.  He opined that Edgell could not work any hours in a day.  He opined that she could stand for 15 minutes at a time and less than 60 minutes in a workday; sit for 30 minutes at a time and for two hours in a workday; occasionally lift 10 pounds; and frequently lift less than five pounds.  She could never bend, stoop, balance, or reach her arm in any direction other than laterally, which she could do occasionally.  She could also frequently perform fine and gross manipulation bilaterally.  He opined that her pain was severe and that she will never be able to return to work. Tr. 598.  Hiner also completed an Off-Task Questionnaire in which he opined that Edgell would likely be off task more than 20% of a workday due to low back pain and right shoulder pain.  He stated that Edgell would be absent more than four times per month.  Tr. 599.

### 2. Consultative Examiners

On October 7, 2014, Edgell saw Dr. Dallara, Ph.D., for a consultative examination.  Tr. 306.  Her chief complaints were problems with her back and right shoulder, asthma, Parkinson's disease, and sleep apnea.  Tr. 305.  She reported briefly receiving outpatient psychiatric

treatment through the Portage Path Behavioral Health Center approximately three years prior. Tr. 306.  She described her daily activities as watching TV, taking naps, attempting to do household chores, microwave cooking, some cleaning and laundry, and going shopping accompanied by a friend.  Tr. 307.  Dr. Dallara opined that Edgell could be expected to understand and apply instructions in a work setting consistent with low average intellectual abilities; did not show easy distractibility; and may have some difficulties relating to others and withstanding the stress and pressure of day-to-day work activity due to her depression and anxiety.  Tr. 310.

On February 20, 2017, Edgell saw Dr. Magleby, Ph.D, for a consultative examination. Tr. 454.  Edgell reported anxiety and panic attacks when she is around people and depression due to her physical conditions.  Tr. 454.  Dr. Magleby's diagnostic impressions were persistent depressive disorder with mixed features with pure dysthymic syndrome-moderate, with avoidant and borderline traits.  Tr. 459.  He opined that her ability to maintain attention and concentration was fairly average, observing that her memory appeared somewhat impaired in general with poor short-term recall possibly related to Parkinson's disease.  Her ability to maintain persistence and pace was somewhat impaired, although she was not overly distracted; she showed fairly average ability to perform simple repetitive tasks and her ability to perform multi-step tasks appeared somewhat impaired; her ability to get along with peers, coworkers, and supervisors was fairly appropriate; and her ability to withstand the mental stress and pressures associated with day-to-day work activity appeared somewhat impaired due to chronic and persistent depression, maladaptive personality traits, and distress related to her neurological disorder and any decline in future functioning.  Tr. 459.

### 3. State Agency Reviewers

On January 21, 2017, state agency reviewing physician Dr. Torello, M.D., reviewed Edgell's record and adopted a prior ALJ's RFC: Edgell can perform light work with some postural restrictions.  Tr. 116.  On August 2, 2017, state agency reviewing physician Dr. Thomas, M.D., agreed.  Tr. 136.

On March 7, 2017, state agency reviewing psychologist Dr. Richardson, Ph.D., reviewed Edgell's record and adopted a prior ALJ's RFC: Edgell can perform simple, routine tasks in a static environment, with infrequent changes and no strict time or fast-paced production quotas, and frequent interaction with others.  Tr. 116, 94.  On August 1, 2017, Dr. Warren, Ph.D., agreed.  Tr. 137.

### E. Testimonial Evidence

#### 1. Edgell's Testimony

Edgell was represented by counsel and testified at the administrative hearing.  Tr. 58. She lives in an apartment with her adult son.  Tr 59.  She is able to drive short distances.  Tr. 59. She does not have a car.  Tr. 59.  She gets around by friends driving her and her insurance arranges transportation for doctor visits.  Tr. 59.

When asked why she is unable to work, Edgell cited her back, her stroke, and her Parkinson's disease.  Tr. 60.  Regarding her back, Edgell stated that it started when she fell at work in 2001 and she was found to have spondylolisthesis.  Tr. 60.  She had back surgery in 2004, which did not really help.  Tr. 61.  Additional surgeries have not been recommended.  Tr. 61.  Since her surgery, she was told that she was unable to get any injections in her back.  Tr. 62. Also, sometimes her left foot drags or gets sore.  Tr. 61.  For treatment for her back, they had given her medication for awhile, and then they had her do physical therapy for awhile, and she sees a chiropractor to ease her pain.  Tr. 61.  It had been about two years since she tried physical

therapy and it did not help; in fact, it hurt more.  Tr. 61.  Her chiropractic visits with Hiner, whom she has seen since she was hurt at work, help for a couple of days because he pushes on her shoulder where it hurts from her stroke in 2011.  Tr. 61-62, 72.  Her stroke primarily affects her right side.  Tr. 62.  She doesn't use a cane or a walker, but she keeps a walker by her bed in case she needs one.  Tr. 62.  She needs it every so often, when she is really stiff.  Tr. 62.

Edgell testified that she was diagnosed with Parkinson's disease in 2008.  Tr. 62.  She takes medications for her impairments and they make her tired.  Tr. 63.  She uses a pill container to keep track of her medications.  Tr. 63.  Her son is on disability and has the mind of a child; they help each other a little bit.  Tr. 63.  They like to use the microwave to cook and Edgell does the dishes.  Tr. 63.  She uses a lightweight Swifter to clean the floor.  Tr. 63.  She can "go down" and do the laundry on certain days, and either her brother or her son will help and "lift it up."  Tr. 64.  Her brother or her friends will take her grocery shopping.  Tr. 64.  She goes to the grocery store about once a month and gets a lot of things; it takes about an hour and she gets tired.  Tr. 64.  Whoever takes her helps her put the groceries in the cart.  Tr. 64.

Regarding her mental health treatment, Edgell stated that she used to see a psychologist for one-on-one counseling about once or twice a month, but he had to leave the practice.  Tr. 64, 65.  He had recommended she do group therapy but she did not want to discuss her problems in front of a group.  Tr. 65.  She has to see a new neurologist in December and her new neurologist will give her the name of a new psychologist.  Tr. 64-65.  She is on Wellbutrin for her depression and anxiety.  Tr. 65.  She was never given home exercises to do, such as breathing techniques.  Tr. 66.  Her depression causes crying spells, which she will have a couple of times a week or if she gets upset about something.  Tr. 66.  She has also noticed issues with her memory: if she is asked a question now, she may not remember the answer until a couple days later.  Tr. 66.

On a typical day, Edgell will get up and take her medication.  Tr. 66.  Her right side is always hurting her since her stroke.  Tr. 66.  She will do half the dishes, sleep, and then wake up in the middle of the day and finish the rest of the dishes.  Tr. 66-67.  She watches television every once in awhile but ends up just falling asleep.  Tr. 67.  She used to go to church but no longer does so; since she had her stroke, she has trouble being around people due to anxiety.  Tr. 67.  She feels safer just being at home where it is quiet.  Tr. 67.  Aside from her son, she sees an aunt and a cousin on holidays or "they might come get me once in a great while" and a friend who takes her to the store "off and on."  Tr. 67.

When asked to describe the problem with her hands, Edgell stated that she is unable to manipulate the Ziplock-type feature on frozen food packages.  Tr. 68.  Sometimes she is unable to reach back and snap the clasp on her bra.  Tr. 68.  She drops objects such as plates of food and glasses and she spills stuff once in a while.  Tr. 68.  She has carpal tunnel and arthritis in her hands and her Parkinson's makes her hands shake.  Tr. 69.  Her hands shake all the time.  Tr. 69.  To help with her tremors, she takes cinnamon and medication.  Tr. 69.  She can take an extra pill, which she does when she is around family so they don't see her hands shake.  Tr. 69.  She wears "gloves" on both hands for her carpal tunnel.  Tr. 69.  She got injections in her thumbs but they didn't really help.  Tr. 70.  Her Parkinson's causes stiffness throughout her body, which is worse in the winter.  Tr. 70, 74.  She also has fibromyalgia throughout her whole body.  Tr. 69.  She has to go up stairs every day and sometimes she just stays downstairs in her recliner.  Tr. 70.  Steps are difficult because it hurts to use the handrail and also her hurts her back.  Tr. 70.

At the hearing, Edgell stated that, when she got home, she was probably going to be on ice for awhile because she had to walk through a parking deck and she got lost.  Tr. 75.  It hurts to walk due to her low back surgery and she drags her left foot after she has been walking a

while.  Tr. 75.  She was unable to estimate how long she had been walking that morning in the parking lot and to the hearing room.  Tr. 75.

Being around "a bunch" of people, like when she is at the store, makes her nervous.  Tr. 71.  She also hates people seeing her hands shake and she never knows when something is going to fall out of her hand.  Tr. 71.  She also has anxiety attacks, maybe two or three a month.  Tr. 71.  They are caused by stress, like when she is waiting for transportation to go to the doctor and it doesn't show up; she worries about being late.  Tr. 71.

When asked how her condition has changed in the 2 ½ years since a prior ALJ had issued an unfavorable decision in her case, Edgell answered that her condition has worsened.  Tr. 72.  She is stiffer and she shakes more.  Tr. 72.  When asked where in the record a fibromyalgia diagnosis had been made, Edgell's attorney stated that he did not notice in the record where it had been made and he believed it was a remote diagnosis that had been carried through.  Tr. 83.  Edgell stated that she had been told she had fibromyalgia when she fell and hurt her back.  Tr. 83.

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 75-82.  The ALJ asked the VE to determine whether an individual of Edgell's age, education, and vocational history could perform work if she had the limitations subsequently assessed in the ALJ's RFC determination.  Tr. 77-78.  The VE answered that such an individual could perform the following jobs with significant numbers in the national economy: information clerk, ticket taker, and retail sales clerk.  Tr. 78.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 19, 2019, decision, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since October 27, 2016, the application date.  Tr. 35.

2.    The claimant has the following severe impairments: morbid obesity, chronic pain syndrome, post-laminectomy syndrome, lumbar spondylolisthesis with radiculopathy—status post spinal surgery in 2004, degenerative disc disease of the cervical spine, bilateral carpal tunnel syndrome, osteoarthritis of bilateral thumbs, Parkinson's disease, tremors, chronic obstructive pulmonary disease (COPD), asthma, obstructive sleep apnea (OSA), angina pectoris, coronary artery disease (CAD), hypertension, status post cerebrovascular accident (CVA), depressive disorder, anxiety neurosis, post-traumatic stress disorder (PTSD), neurocognitive disorder, and alcohol use disorder.  Tr. 35.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 36.

4.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except frequently push, pull, and operate hand controls with the bilateral upper extremities; never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally reach overhead, frequently reach in all other directions with the bilateral upper extremities, frequently handle and finger with the bilateral upper extremities; should avoid concentrated exposure to extreme cold, extreme heat, humidity, dust, odors, fumes, gases, poor ventilation, and other pulmonary irritants, and

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

avoid all exposure to hazards such as unprotected heights and moving mechanical parts; can perform simple, routine, and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work; can interact on a frequent basis with others, including supervisors, coworkers, and the general public; and can respond appropriately to occasional changes in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.  Tr. 38.

5.    The claimant has no past relevant work.  Tr. 43.

6.    The claimant was born in 1965 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.  Tr. 43.

7.    The claimant has at least a high school education and is able to communicate in English.  Tr. 43.

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 43.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 43.

10.   The claimant has not been under a disability, as defined in the Social Security Act, since October 27, 2016, the date the application was filed. Tr. 44.

### V. Plaintiff's Arguments

Edgell argues that the ALJ did not conduct a proper analysis of her alleged symptoms pursuant to SSR 16-3p and that new and material evidence warrants remand.  Doc. 12, p. 1.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A. The ALJ did not err when assessing Edgell's statements regarding her symptoms**

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.  The ALJ will consider daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.  *Id*. at *7-8. The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *4.

Edgell argues that the ALJ did not properly account for her subjective symptoms as required by SSR 16-3p.  Doc. 12, p. 12.  The ALJ considered Edgell's allegations regarding her

physical symptoms as follows:

> The claimant's allegations are determined to be less than fully consistent with the evidence. The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. The claimant has a wide array of physical impairments, including some serious one such as Parkinson's disease, the residuals of a stroke, and a history of a back surgery, with several positive examination findings, but a physical examination performed in 2018 showed a normal gait, a negative straight leg raise test bilaterally, and no evidence of tremors (Exhibit D23F, pg.2). The claimant has a history of noncompliance with medical recommendations, further eroding the consistency of her allegations. For example, Dr. Black assigned her with a diagnosis of noncompliance with medical recommendations, and treatment notes from Comprehensive Pain Management taken in 2018 indicate that she did not follow up with treatment due to transportation issues, and did not obtain an x-ray of the cervical spine as ordered.

Tr. 41.

Edgell argues that there is a "mention" of noncompliance only once in the record, from Dr. Black, and that reference is "very vague."  Doc. 12, p. 13.  She asserts, "[w]ithout more of an explanation, this comment should not outweigh the overwhelming documentation of ongoing treatment in this record[.]"  Doc. 12, p. 13.  Edgell does not dispute that she did not follow up with treatment with Dr. Wynne or obtain an x-ray of her cervical spine as ordered; rather, she notes that these instances of noncompliance were due to transportation issues, and submits that the failure to comply with medical recommendations due to transportation issues is not a valid reason to discredit her symptoms.  Doc. 12, p. 15.  However, Dr. Black did more than just "mention" noncompliance; he diagnosed her with noncompliance, as the ALJ noted.  Tr. 596, 41. Moreover, other evidence in the record shows that Edgell was not complaint with treatment.  See Tr. 804 (Crystal Clinic Orthopaedic Center treatment note stating that updated physical therapy was recommended for her cervical spine but Edgell "declines").  Thus, Edgell's assertion that there was only one, vague reference to non-compliance in the record is not well-taken.  Her assertion that her chiropractor stated that she was complaint with treatment by attending

appointments (Tr. 470) does not change the fact that the record contains instances where she was not compliant with treatment.  Finally, regarding Edgell's mental health treatment, the ALJ commented that Edgell had a limited treatment history, she improved with counseling and medications, and she had reported mild to moderate symptoms during her consultative examinations.  Tr. 41.

Next, Edgell argues that the ALJ relied on one treatment note from 2018 in which she had a normal exam but ignored numerous visits in which her exam findings were abnormal. Doc. 12, p. 14.  In support, she cites various exam findings that precede her alleged onset date, October 1, 2016.  Doc. 12, p. 14.  Of the three treatment notes she cites that post-date her alleged onset date, two are treatment notes from Hiner that showed pain upon palpation, muscle spasm and decreased range of motion in her spine, and one from Dr. Wynne from July 2017 that showed tenderness and decreased range of motion in her spine.  Tr. 393, 394, 581.  But Dr. Wynne's treatment note also showed a normal gait, normal motor strength, negative straight leg raise testing, and no evidence of tremors.  Tr. 581.  The ALJ discussed a treatment note from Edgell's 2018 visit with Dr. Wynne in which Edgell had the same findings: tenderness, decreased range of motion, no evidence of tremors, and negative straight leg raise testing.  Tr. 39, 761.  In other words, the ALJ acknowledged Edgell's exam findings showing tenderness and decreased range of motion in her spine, but observed that, despite these findings, she maintained a normal gait, negative straight leg raise testing, and no evidence of tremors.

Edgell asserts that the ALJ did not properly consider her imaging results which, she alleges, are consistent with her allegations of symptoms.  Doc. 12, p. 15.  The ALJ considered Edgell's imagining results, Tr. 40, and Edgell does not describe an error by the ALJ beyond simply asserting that the imaging supports her alleged symptoms.  She complains that the ALJ's

consideration of the factors set forth in SSR 13-6p "falls short" because he did not discuss certain factors.  Doc. 12, p. 17.  However, an ALJ is required to consider the factors; he is not required to discuss all of them.  *Collins v. Comm'r of Soc. Sec.*, No. 5:18cv2082, 2019 WL 3797931, at *5 (N.D. Ohio July 30, 2019)[2] (citing *Cross v. Commissioner*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).  So long as the ALJ "sufficiently articulate[s] the assessment of the evidence to assure the court that the ALJ considered all relevant evidence," the ALJ's adherence to SSR 16-3p is sufficient.  *Id.*  Here, the ALJ sufficiently articulated his assessment of the evidence.  In addition to the evidence detailed above, the ALJ discussed Edgell's activities of daily living and assessed the opinion evidence, which Edgell does not challenge.

In short, the ALJ did not err when assessing the credibility of Edgell's statements and his findings are supported by substantial evidence.

### B. Edgell is not entitled to a Sentence Six remand

Edgell asserts that she is entitled to a remand based on new and material evidence she obtained after the ALJ's decision.  Sentence six of 42 U.S.C. § 405(g) allows a court to remand to the agency to develop additional evidence in the record, "but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding."  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (quoting § 405(g)).  The plaintiff has the burden to demonstrate that the evidence she now presents in support of a remand is "new" and "material" and that there was "good cause" for her failure to present it in the prior proceedings.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding"; material "only if there is a reasonable probability that the

---

[2] Report and recommendation adopted, 2019 WL 3804149 (N.D. Ohio Aug. 13, 2019).

Secretary would have reached a different disposition of the disability claim if presented with the new evidence"; and a claimant shows good cause "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id*. (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (internal quotations omitted)).

Here, Edgell's evidence is new in the sense that it was not in existence at the time of the ALJ's decision. However, even assuming, *arguendo*, that she could show it is material, she does not demonstrate good cause for her failure to acquire the evidence prior to the hearing.

The new evidence shows that, on March 28, 2019, nine days after the ALJ's decision, Edgell saw Dr. Gebel. According to Dr. Gebel, Edgell "spent most of the visit explaining to me why her SSI application was denied and discussing errors that she feels were made by the SSI physician." Tr. 10. Dr. Gebel referred her to a physical therapist to conduct a functional capacity evaluation to assess her capacity to work and the validity of her subjective complaints, due to her "stated disability." Tr. 11. Thus, it is clear from the record that the impetus driving Edgell to obtain a functional capacity evaluation referral from Dr. Gebel was the fact that the ALJ had recently denied her application. "The good cause requirement is not met by the solicitation of a medical opinion to contest the ALJ's decision." *Zimmerman v. Comm'r of Soc. Sec.*, 2010 WL 5293809, at *7 (W.D. Mich. Nov. 17, 2010)[3] (citing *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)); *see also Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (explaining that the good cause requirement would be meaningless if every time a claimant lost before the agency she was free to seek out a new expert witness who might better support her position). Edgell is not entitled to a Sentence Six remand.

---

[3] Report and recommendation adopted, 2010 WL 5289274 (W.D. Mich. Dec. 17, 2010).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: July 15, 2020

_/s/ Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981). _See also Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).